IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT PARK NETWORKS, LLC,[1] | Case No. 14-10520 (MFW) |
| Debtor. | **Objection Deadline: August 13, 2015 at 4:00 p.m. (ET)**<br>**Hearing Date: August 20, 2015 at 3:00 p.m. (ET)** |

## DEBTOR'S MOTION TO CONVERT TO A CASE
## UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

The above-captioned debtor and debtor-in-possession (the "**Debtor**"), by and through its undersigned counsel, hereby moves the Court (the "**Motion**") pursuant to section 1112(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") for an order converting this case to a case under Chapter 7 of the Bankruptcy Code.  In support of this Motion, the Debtors respectfully state as follows:

### JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157.

### RELEVANT BACKGROUND

**A.    The Debtor's Corporate Structure**

2.    The Debtor was formed as a Delaware limited liability company by the filing of a Certificate of Formation with the Delaware Secretary of State on August 11, 2011.  The Debtor has also registered to do business in the State of California and the State of Connecticut.  The Debtor is governed by an Amended and Restated Limited Liability Company Agreement dated

---

[1]    The last four digits of the Debtor's federal tax identification number are 8495. The Debtor's headquarters and mailing address is 1840 Century Park East, 18th Floor, Los Angeles, California 90067.

December 31, 2012.  On September 29, 2011, the Department of the Treasury, Internal Revenue Service, issued the Debtor Employment Identification Number 45-3458495.

**B.    The Debtor's Pre-Petition Business and Events Leading to Bankruptcy**

3.    In April 2011, American Broadcasting Companies ("**ABC**") announced the cancellation of its storied soap operas One Life to Live ("**OLTL**") and All My Children ("**AMC**").  Seeing an opportunity to launch new episodes of these soap operas as original content for online consumption, the Debtor entered into an exclusive license agreement with ABC for all of the elements of OLTL and AMC – storylines, characters, themes and plots.  In the agreement, ABC promised not to do anything to hinder the Debtor's exercise of its rights over the shows.

4.    Not long after the Debtor was compelled to suspend an early launch of the online series, ABC asked to "borrow" certain OLTL characters for use on ABC's remaining soap, General Hospital ("**GH**"), in a limited and short-term capacity. ABC promised consultation, script approval, and expressly swore not to do any damage to the "canon" of OLTL. Yet, even before the ink dried on the parties' agreement, ABC began unilaterally changing key storylines and themes, literally killing some OLTL characters and deeply integrating others into the GH landscape, all to create a mega soap of GH behind the Debtor's back. The changes bewildered and alienated longtime OLTL fans. ABC even went so far as to induce the actors who had been playing some of the more popular characters on OLTL to sign secret, exclusive, multi-year contracts with ABC — all without a word to the Debtor.

5.    When the Debtor announced in December 2012 that it had raised the tens of millions of dollars necessary to produce new shows, ABC's reaction was swift and punitive. ABC refused to run advertising for the new shows, refused to permit the Debtor access to the

shows' social media and websites, attempted to prevent guest appearances by the OLTL actors on ABC's talk shows and even interfered with third party agreements. Confronted with losing its entire investment or trying to pick up the pieces and press on, the Debtor eventually produced one new season of OLTL and of AMC. But, the damage could not be undone, nor the fans reclaimed. As a consequence of ABC's fraud and its multiple breaches of both the express terms of the parties' contract and the implied covenant of good faith and fair dealing included in every contract in California, the Debtor has sustained the loss of its investment of over $30 million, as well as the profits that it stood to make had ABC acted as the partner it had held itself out to be.

6.      On April 18, 2013, the Debtor commenced an action against ABC in the Superior Court of the State of California, County of Los Angeles (the "**Los Angeles Court**"), Case No. BC506052, seeking recovery of its damages and other available relief resulting from ABC's actions (the "**ABC Lawsuit**" or the "**ABC Litigation**").

7.      Prior to the Petition Date, the Debtor's interests in the ABC Lawsuit were represented by James E. Maloney, Esquire of Andrews Kurth LLP and Michael Weinstein, Esquire of Lavely & Singer.  Each of these firms provided representation to the Debtor in the ABC Lawsuit on an hourly fee basis.  The successes of the Debtor's pre-petition litigation counsel include favorable rulings which permitted the Debtor to continue using the license for OLTL and AMC, as well as substantial progress in document discovery and related matters.

8.      Meanwhile, the Debtor's income stream from agreements with Hulu, LLC and Apple, Inc. for the distribution of the newly produced episodes of OLTL and AMC (through the online video services Hulu and iTunes, respectively) proved insufficient to meet all of the Debtor's liabilities incurred in connection with the production of those shows, particularly in

light of the significant legal expenses being incurred by the Debtor in prosecuting the ABC Lawsuit.

9.      Ultimately, certain of the Debtor's creditors initiated potentially precipitous collection actions, including requests for the entry of pre-judgment attachment of the Debtor's entitlement to the Tax Credit.  The Debtor commenced these Chapter 11 proceedings to preserve its assets for the benefit of all creditors and stake-holders, and to restructure its liabilities and reorganize its financial affairs while continuing to vigorously prosecute its claims in the ABC Lawsuit.

**C.     The Debtor's Bankruptcy Filing, Assets and Liabilities**

**(i)     Generally**

10.     On March 10, 2014 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The bankruptcy case is pending before the Honorable Mary F. Walrath and is assigned Case No. 14-10520-MFW.  Since the Petition Date, the Debtor has managed its affairs as debtor and debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

11.     As set forth in the Debtor's schedules, the Debtor's assets consist of (i) checking account balances of approximately $20,000 as of the Petition Date; (ii) receivables form Hulu, iTunes and the Online Network derived from distribution of the Debtor's episodes of OLTL and AMC; (iii) a Tax Credit from the Connecticut Office of Film, Television & Digital Media; (iv) litigation claims; (v) registered copyrights on episodes of One Life to Live and All My Children produced by the Debtor; (vi) licenses, format rights and other intellectual property set forth in that certain License Agreement between American Broadcasting Companies, Inc. and the

Debtor; (vii) goods on consignment; (viii) the domain name www.toln.com; (xix) intellectual property related to the Online Network; and (x) physical copies of One Life to Live and All My Children episodes. The Debtor's most significant asset is the ABC Litigation. The Debtor's gross recovery from the ABC Litigation will range from $0.00 to $95,000,000.

12.    As of the Petition Date, the Debtor's liabilities consisted of unsecured debt owed to vendors of goods and services used by the Debtor in connection with the production of OLTL and AMC, including video, sound and lighting equipment and production, studio space and license obligations. The Debtor also has unsecured debt stemming from pre-petition consulting agreements, actor agreements, production agreements, executive producer agreements, and collective bargaining agreements relating to union labor services. The Debtor also owes significant debts to its former professionals in connection with the ABC Litigation.

13.    In sum total, and excluding Guild claims, the Debtor estimates that the present liabilities of the estate are as follows: (i) administrative expense claims in excess of $888,000; (ii) secured claims of $130,000[2]; (iii) priority tax claims of $28,487.71; and (v) general unsecured claims of $5,841,948.84.

14.    Post-petition, the Debtor's source of income has been revenue generated from viewings of its shows on Hulu. However, Hulu has been granted stay relief to terminate its agreement to distribute the Debtor's media as of July 31, 2015. *See* Docket No. 285.

   **(ii)    The Tax Credit Loan**

15.    As part of its business strategy in producing new episodes of OLTL and AMC, the Debtor filmed in the state of Connecticut. Connecticut legislation provides for eligible multimedia companies to receive a tax credit on qualified production expenses incurred in the

---

[2]    The Creditors' Committee has raised issues regarding the scheduled claim of Prospect Park, LLC as a secured claim.

state.   The Debtor incurred such qualified production expenses in Connecticut in 2013, and earned a tax credit voucher from the State of Connecticut for its production related expenditures within the State of Connecticut (the "**Tax Credit**").   Prior to the Petition Date, the Debtor agreed to sell the Tax Credit to Apple, Inc. and pledged the anticipated proceeds from that sale as collateral to secure the Debtor's indebtedness to GEPF, LLC.   Specifically, the Debtor, as seller, entered into a Film Tax Credit Purchase Agreement with Apple, Inc. on April 1, 2013, and a First Amendment to Tax Credit Purchase Agreement dated June 12, 2013 (together, the "**Tax Credit Purchase Agreement**").   By a Second Amendment to Tax Credit Purchase Agreement, Apple, Inc. has agreed to extend the "Closing Date" under the Tax Credit Purchase Agreement to September 30, 2014.   On June 19, 2013, the Debtor entered into a Tax Credit Loan with GEPF, LLC d/b/a EP Financial Solutions ("**GEPF**"), through which the Debtor borrowed $5,007,140.00 from GEPF (the "**Tax Credit Loan**").   The Tax Credit Loan is comprised of borrowed funds in the amount of $4,243,308.00, lender fees in the amount of $125,143.00; a one year prepaid interest reserve in the amount of $388,332.00 and a holdback in the amount of $250,357.00.   The Tax Credit Loan is evidenced by a Promissory Note and Loan and Security Agreement each dated June 19, 2013.

16.     Through the efforts of the Debtor and its professionals post-petition, the Debtor successfully obtained approval to continue the services of Cohn & Reznick, its pre-petition auditors, in connection with the Debtor's post-petition application for the Tax Credit. Ultimately, the Debtor successfully obtained the Tax Credit and consummated the Tax Credit Purchase Agreement by completing the sale of the Tax Credit to Apple.   The Debtor's efforts resulted in full satisfaction of the Tax Credit Loan.

**(iii)    Guild Claims**

17.    The Debtor is a party to, or otherwise bound by, certain Collective Bargaining Agreements (the "**CBAs**") with various entertainment guilds, principally including, SAG-AFTRA, Theatrical Drivers and Helpers Local 817, Writers Guild of America, East, Inc., Writers Guild of America, West, Inc., IATSE New York Production Local Union, and the Directors Guild of America (together, the "**Guilds**").  The CBAs are executory contracts in bankruptcy, subject to the provisions of Section 1113 of the Bankruptcy Code.

18.    Under the CBAs with each of the Guilds, when the Debtor is the copyright holder (*i.e.*, the producer) of a film, they are initially responsible for paying to the guilds: (i) residual payments owed to guild members for certain exploitations of a film in which their services are used and credited, and (ii) certain fringe payments such as social security withholdings, unemployment insurance, disability insurance payments and contributions to health and retirement plans created pursuant to the CBAs (collectively, the "**Guild Obligations**").  In general, the calculation of residuals owed, as specified in the applicable CBAs, for each exploitation of a film depends on several factors such as the type of film being exploited (*i.e.*, whether the film is an MFT film, mini-series, etc.), how the film is exploited (*i.e.*, broadcast on network television, broadcast on cable television, and sale of the home video versions of the film), and the number of times that the film has been previously exhibited (in the case of free television rebroadcasts, the amount per rebroadcast decreases as the number of rebroadcasts increases).

19.    The Debtor believes that one or more of the Guilds may hold significant administrative, priority and/or general unsecured claims against the Debtor. The Guilds assert that the CBA's contain mandatory alternative dispute resolution and other procedures which otherwise vary from what is required under the Bankruptcy Code.

**D.    The Debtor's Post-Petition Efforts**

20.    Upon the commencement of this Bankruptcy Case, the Debtor and its professionals worked diligently to (i) ensure that the Debtor obtained the Tax Credit and consummated the Tax Credit Sale Agreement; (ii) secure post-petition counsel to represent the Debtor in the ABC Litigation; and (iii) confirm a Plan of Liquidation which would allow the Debtor to exit Chapter 11, complete prosecution of the ABC Litigation, and satisfy the claims of creditors under the supervision of an independent liquidating trustee.

21.    Regarding the Tax Credit, the Debtor first successfully obtained authority to retain Cohn Reznick LLP as its auditors in Connecticut [Docket No. 58]. Over the following 2-3 months, the Debtor completed its financial audit and the application for the Tax Credit. The Debtor filed its motion for authority to consummate the Tax Credit Sale on August 4, 2014 [Docket No. 85]. The Court entered an order approving that motion on August 25, 2014.

22.    The Debtor then submitted the completed Tax Credit application to the Connecticut authorities, obtained the Tax Credit, and consummated the sale of the Tax Credit to Apple. As the Debtor had anticipated, there was a surplus of funds remaining after the sale of the Tax Credit. However, and unfortunately, those proceeds were significantly less than the Debtor had estimated.

23.     This, in turn, negatively impacted the Debtor's ability to secure special counsel to represent it in the ABC Litigation.  Because the Debtor's efforts to continue the pre-petition representation by Andrews Kurth LLP were unsuccessful, the Debtor successfully negotiated to retain the premiere law firm of Jones Day to represent it in the ABC Litigation on a pure contingency fee basis.  The Debtor obtained the Court's authority to retain Jones Day (over the Committee's objection) by Order dated September 25, 2014 [Docket No. 152] (the "**Jones Day Order**").

24.     Pursuant to the Jones Day Order, Jones Day's engagement was contingent upon the payment of a Litigation Cost Reserve in the amount of $400,000.  The Debtor anticipated that its cash on hand, plus the anticipated proceeds from the Tax Credit Sale Agreement, would provide it with sufficient funds to pay the Litigation Cost Reserve.

25.     However, and unfortunately, the surplus from the Tax Credit Sale proved insufficient to fund the Cost Reserve.  This was due to delays beyond what had been reasonably predicted by the Debtor, resulting in increased default interest charges by GEPF.  Moreover, the secured creditor claims excessive attorneys' fees against the tax credit sale net proceeds far in excess of what the Debtor had anticipated.[3]

26.     Subsequently, the Debtor thoroughly explored alternatives to finance the Cost Reserve.  Over the next several months, the Debtor contacted at least five potential lenders or investors in an effort to obtain the funds necessary to finalize the retention of Jones Day.  The Debtor and its professionals participated in numerous informational meetings and conferences, all in an effort to obtain suitable financing for the Debtor to retain Jones Day and, ultimately, exit Chapter 11.

---

[3]     For the benefit of the estate, the Debtor has preserved objections to GEPF's secured claim, including as to the interest and attorneys' fees claimed.

27.    Ultimately, the Debtor obtained term sheets or expressions of interest from two potential funding sources.    After careful review, the Debtor, with the full support of the Committee, selected the best prospective offer and proceeded to refine its proposal.  During this time, the Debtor and the Committee further engaged in extensive efforts to negotiate disputed claims and objected to certain claims.  *See* Docket No. 310.

28.    As the process evolved, difficulties arose in resolving disputes regarding the Guild claims, the specific provisions of the Debtor's plan of liquidation, and other matters which, despite the diligence and good faith of all parties involved, delayed the consummation of a financing transaction.

29.    Meanwhile, Jones Day expressed its intention to terminate its involvement with the Debtor if Jones Day does not receive the Cost Reserve by May 15, 2015.  At the same time, ABC began to take a more aggressive position in the ABC Litigation.  Specifically, ABC filed a Case Management Statement in the ABC Litigation in which it suggested to the Los Angeles Court that the litigation should be dismissed.

30.    When the Cost Reserve was not funded by May 15, Jones Day provided formal notice that it would not proceed with being retained by the Debtor.  The Debtor and its professionals quickly engaged a search to find substitute counsel, working with its prospective funding source and the Committee to ensure that any retention could be consummated in a manner which would also allow the Debtor to quickly exit Chapter 11.  The Debtor spent a number of weeks working with potential replacement counsel, also a top L.A. firm, on the terms of an engagement, but ultimately, no agreement was reached.

31.    During this time, the Los Angeles Court held two more Case Management Conferences. On May 12, 2015, the Los Angeles Court declined to consider ABC's suggestion that the ABC Litigation should be dismissed, and instead continued the Case Management Conference to July 13, 2015. At that time, ABC requested an order providing that the ABC Litigation would be dismissed if the Debtor did not secure replacement counsel by a date certain. The Debtor, appearing through its bankruptcy counsel, informed the Los Angeles Court of its intention to seek conversion to Chapter 7, and requested that the Los Angeles Court simply continue the ABC Litigation so as to provide time for a bankruptcy trustee to retain counsel. The Los Angeles Court agreed, and did no more than continue the Case Management Conference to October 5, 2015.

## RELIEF REQUESTED AND BASIS THEREFOR

32.    Since the Debtor first filed its Plan of Liquidation on August 7, 2014, the Debtor has advocated for the appointment of an independent fiduciary to oversee the wind-down of the Debtor's affairs upon the effective date of the Plan. *See* Docket No. 88. The Debtor contemplated that this fiduciary would be a liquidating trustee completing the ABC Litigation and making distributions to creditors after confirmation of a Chapter 11 Plan.

33.    Nearly one year later, after the Debtor's successes in fully satisfying the largest single claim in this case (the secured claim of GEPF) and in preserving its assets as a debtor-in-possession, the Debtor still believes that an independent fiduciary must be appointed to protect the interests of all parties in this bankruptcy case. However, the Debtor now believes that this fiduciary should be a Chapter 7 trustee.

34.    Section 1112(a) of the Bankruptcy Code provides that:

(a) The debtor may convert a case under this chapter to a case under chapter 7 of this title

unless--

> (1) the debtor is not a debtor in possession;
>
> (2) the case originally was commenced as an involuntary case under this chapter;
>
> or
>
> (3) the case was converted to a case under this chapter other than on the debtor's
>
> request.

11 U.S.C. § 1112(a).

35.    It is undisputed that none of the statutory exceptions to the provisions of Section

1112(a) are present in this case.  The Debtor is and remains a debtor-in-possession, and this is

not an involuntary case or a previously converted case.  Unless one of the statutory exemptions

apply, at least one court from within the Third Circuit has held that Section 1112(a) affords a

debtor-in-possession "an absolute right to convert" a chapter 11 case to a case under chapter 7. *In

re Dieckhaus Stationers of King of Prussia, Inc.*, 73 B.R. 969, 971 (Bankr. E.D. Pa. 1987) (citing

legislative history as "affirming Congress' intent to give debtor an absolute right to convert from

chapter 11 to chapter 7); *see* House Report No. 95-595, 95th Cong., 1st Sess. 405 (1997); Senate

Report No. 95-989, 95th Cong., 2d Sess. 117 (1978).

36.    Regardless whether the Debtor's right to convert under Section 1112(a) is

absolute, the Debtor submits that cause exists for conversion to Chapter 7.  Specifically, the

Debtor's revenue stream from Hulu is set to expire on July 31, 2015.  *See* Docket No. 284.  The

Debtor's Chapter 11 estate is administratively insolvent[4] because the outstanding and unpaid fees

---

[4]    The Debtor's counsel (Genovese Joblove & Battista and Chipman Brown Cicero and Cole) had agreed, in the
context of the filed plan, to defer payment of their fees post-confirmation, and have not received any post-petition

awarded to estate professionals exceeds the amount of cash the Debtor has on hand. The best hope for a meaningful recovery to creditors is successful prosecution or settlement of the ABC Litigation. The Debtor has been unable to formally retain counsel in the ABC Litigation, despite the significant and diligent efforts of the Debtor and its professionals. Given the numerous continuances already granted by the Los Angeles Court, the Debtor is gravely concerned that negative results may come to pass if the Debtor does not have counsel in place by the next Case Management Conference on October 5, 2015.

37.    The immediate need for a trustee is further emphasized by other recent developments in the ABC Litigation. For example, the Debtor recently learned that substantial electronic documents it obtained in the ABC Litigation would be subject to destruction if the Debtor did not pay outstanding post-petition invoices due to the document storage vendor. In order to preserve those documents and the value they contribute to the Debtor's litigation claims, undersigned counsel, despite its substantial unpaid post-petition fees, paid the vendor's invoice as a cost advance to its client in order to preserve litigation value for this chapter 7 estate. The Debtor and the Debtor's counsel have done everything to keep the ABC Litigation alive for the benefit of creditors.

38.    The Debtor is requesting conversion to Chapter 7 in good faith. Under these circumstances, the Debtor believes that the swift appointment of an independent fiduciary to conclude this estate will maximize the potential recovery for creditors and is in the best interests of all creditors and other parties in this case. The Debtor believes it is important that a Chapter 7 Trustee be given as much time as possible to get up to speed and retain counsel for the ABC Litigation well in advance of the October 5 Case Management Conference before the Los

---

payments. Counsel for the Official Committee of Unsecured Creditors have not so agreed, have been paid fees post-petition, and have made requests for further payment. Payment of the requested fees will further increase the administrative insolvency and deplete funds available to a Chapter 7 Trustee.

Angeles Court. Any further delay in the appointment of a trustee might prejudice the Debtor's prospects in the ABC Litigation.

39. The Debtor does not believe that appointment of a Chapter 11 Trustee or dismissal of this bankruptcy case are preferable to conversion to Chapter 7. Continued operation in Chapter 11 with a trustee would result in greater administrative expense than conversion, given the increased reporting and compliance requirements of being in Chapter 11. Moreover, the Debtor believes a Chapter 11 trustee would simply be liquidating the estate, rather than reorganizing.[5] Dismissal of this Chapter 11 case also is not preferable, as it would allow the Debtor's remaining assets to waste, while individual creditors would be in a race to the courthouse for judgments on their claims.

40. The Debtor presently has approximately $160,000 cash on hand. The Debtor believes that conversion is appropriate at this time to preserve this cash on hand for at least costs in connection with potential contingency counsel in a chapter 7.

41. It is anticipated that the Official Committee of Unsecured Creditors may object to the relief requested in this Motion. The Debtor has worked diligently with the Committee's counsel prior to filing this Motion, and while the Committee may oppose this relief, the Debtor is not aware of any meaningful alternatives that could be proposed.

42. For the foregoing reasons, the Debtor respectfully submits that conversion to a case under Chapter 7 of the Bankruptcy Code is in the best interests of creditors and all parties in interest.

---

[5]    The Debtor still has rights to the license for OLTL and AMC, and the ultimate resolution of these license rights is part of the ABC Litigation. It is anticipated that a Chapter 7 Trustee would seek to maximize the value of this license in connection with resolution of the ABC Litigation.

WHEREFORE the Debtor respectfully requests that the Court enter an Order converting this case to a Case under Chapter 7 of the Bankruptcy Code pursuant to 11 U.S.C. § 1112(a), and granting such other and further relief as is proper.

Dated: July 22, 2015
      Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

_____

William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
1007 North Orange Street, Suite 1110
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:       chipman@chipmanbrown.com
           olivere@chipmanbrown.com

-AND-

**GENOVESE JOBLOVE & BATTISTA, P.A.**
John H. Genovese (Fla. Bar No. 280852)
Heather L. Harmon (Fla. Bar No. 13192)
Michael L. Schuster (Fla. Bar No. 57119)
(Admitted *Pro Hac Vice*)
100 SE 2nd Street, Suite 4400
Miami, FL 33131
Telephone:    (305) 349-2300
Facsimile:    (305) 349-2310)
Email:       JGenovese@Gjb-Law.com
           HHarmon@Gjb-Law.com
           MSchuster@Gjb-Law.com

*Counsel to Debtor and Debtor-In-Possession*